# EXHIBIT A

DEBTOR IN POSSESSION
LOAN AGREEMENT

THIS DEBTOR IN POSSESSION LOAN AGREEMENT is made and entered into the _____ day of February, 2010, by and between WE THE PEOPLE USA, INC., a Delaware corporation, and WE THE PEOPLE LLC, a Delaware limited liability company (jointly and severally, the "Borrowers"), as debtors and debtors-in-possession in cases (jointly and severally, the "Cases") pending under the Bankruptcy Code (as defined below), and DOLLAR FINANCIAL GROUP, INC., as lender (the "Lender").

RECITALS

On February 19, 2010 (the "Petition Date"), the Borrowers filed voluntary petitions with the Bankruptcy Court (as defined below) initiating the Cases and have continued in the possession of their assets and in the management of their business pursuant to Bankruptcy Code sections 1107 and 1108.

The Borrowers have requested from the Lender a multiple-draw term loan facility in an aggregate principal amount not to exceed Three Hundred Seventy-One Thousand Nine Hundred Sixty Four and No Dollars ($371,964.00) (subject to mandatory and optional reductions in accordance with Section 2.8 and Section 2.9 hereof).

The proceeds of the Loans will be used to provide working capital for, and for other general corporate purposes of, the Borrowers, subject to the terms of this Agreement, the Orders, and the Budget.

To provide security for the repayment of the Loans and satisfaction of the other Obligations of the Borrowers hereunder and under the other Loan Documents, the Borrowers shall provide to the Lender, pursuant to this Agreement and the Orders, an allowed administrative expense claim in the Cases, entitled to the benefits of Bankruptcy Code § 364(c)(1), having a superpriority over any and all claims in the Cases, including without limitation, any and all administrative expenses of the kind specified in the Bankruptcy Code, including without limitation, §§ 503(b) or 507(b) thereof.

All of the Superpriority Claims granted to the Lender hereunder and pursuant to the Orders in the Cases shall be subject to the Carve-Out, but in each case only to the extent provided in Section 2.12 hereof and the Orders.

Accordingly, the parties hereto hereby agree as follows:

SECTION 1
DEFINITIONS

1.1. Defined Terms. As used in this Agreement, the following terms shall have the meanings specified below:

"Affiliate": as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors of such Person, or (b) direct or cause the direction of the management and policies of such Person whether through the ownership of voting securities, by contract, or otherwise.

"Agreement": this Debtor-in-Possession Loan Agreement, as, by separate, written and signed agreement, it may be amended, supplemented, or otherwise modified from time to time.

"Asset Sale": any sale, issuance, conveyance, transfer, lease or other disposition by the Borrowers, in one or a series of related transactions, of any Property of the Borrowers to any Person outside the ordinary course of Borrowers' business.

"Agreements": all agreements, contracts and licenses to which the Borrowers are a party as of the date hereof, or to which the Borrowers become a party after the date hereof, as each such agreement may be amended, supplemented or otherwise modified from time to time.

"Authorizations": all applications, filings, requests, reports, documents, recordings and registrations with, and all validations, exemptions, franchises, waivers, approvals, orders or authorizations, consents, licenses, certificates and permits from Federal, state or local Governmental Authorities.

"Bankruptcy Code": The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. §§101 -1330.

"Bankruptcy Court": the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Cases from time to time.

"Borrowers": the meaning set forth in the preamble to this Agreement, and includes each of the Borrowers individually and both of the Borrowers jointly. As used herein, the plural also includes the singular.

"Borrowing": the making of Loans by the Lender on a single Borrowing Date.

"Borrowing Date": any Business Day specified in a notice pursuant to Section 2.3 as a date on which the Borrowers request a Loan hereunder.

"Borrowing Certificate": a request for Borrowing substantially in the form of Exhibit C hereto.

"Business Day": any day other than a Saturday, Sunday or other day on which banks in the State of Delaware are required or permitted to close.

"Budget": the meaning set forth in Section 4.1(h) hereof.

"Carve-Out": the meaning set forth in Section 2.12 hereof.

"Cases": the meaning set forth in the preamble to this Agreement, and includes each of the Cases and both of the Cases.  As used herein, the plural also includes the singular.

"Cash Collateral": the meaning set forth in Section 363(a) of the Bankruptcy Code.

"Change of Control": the Borrowers consolidate with, or merge with or into, another Person (other than an Affiliate thereof), or any Person (other than an Affiliate thereof) consolidates with, or merges with or into, the Borrowers or the Borrowers sell, assign, convey, transfer, lease or otherwise disposes of all or substantially all of their assets to any Person (other than an Affiliate of Borrowers).

"Closing Date": the date on which the conditions precedent to the making of the first Loan set forth in Section 4.1 hereof have been satisfied or waived.

"Code": the Internal Revenue Code of 1986, as amended from time to time.

"Commitment": the agreement of the Lender pursuant and subject to the terms and conditions of this Agreement to lend up to Three Hundred Seventy-One Thousand Nine Hundred Sixty Four and No Dollars ($371,964.00) to Borrowers, as the same may be reduced from time to time pursuant to Section 2.8 and Section 2.9 hereof.

"Commitment Period": the period from and including the Closing Date to, but not including, the Termination Date.

"Confirmation Order": an order of the Bankruptcy Court confirming a Reorganization Plan in the Case.

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or undertaking to which such Person is a party or by which it or any of the Property owned or leased by it is bound.

"Default": any of the events specified in Section 7 hereof, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Documents": all "documents" as defined in Article 9 of the UCC.

"Dollars" and "$": lawful money of the United States of America.

"Event of Default": the meaning set forth in Section 7 hereof.

"Fees": collectively any amounts payable by Borrowers pursuant to Section 9.6 hereof.

#12148565 v3 (999921.2003)

"Final Order": an order of the Bankruptcy Court entered in the Cases, after a final hearing under Bankruptcy Rule 4001(c)(2), granting final approval of the transactions contemplated by this Agreement and granting the Superpriority Claims described in the recitals above and in <u>Section 2.12</u> hereof in favor of the Lender, in form and substance satisfactory to the Lender in its absolute discretion.

"GAAP": generally accepted accounting principles in the United States of America applied on a consistent basis.

"General Account": the bank account established by the Borrowers that shall be used for the daily concentration of funds received by the Borrowers from the operation of their business, the Loans or otherwise.

"Governmental Authority": any Federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality or any court, in each case whether of the United States or a foreign country.

"Indebtedness": at any time and with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all indebtedness of such Person for the deferred purchase price of property or services (other than property, including inventory, and services purchased, and trade payables, other expense accruals and deferred compensation items arising, in the ordinary course of business, including negotiated trade terms and Chapter 11 expense accruals), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the ordinary course of business), (d) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all capital lease obligations of such Person, (f) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities, (g) all guaranty obligations of such Person in respect of Indebtedness of others referred to in clauses (a) through (f) above, and (h) all Indebtedness referred to in clauses (a) through (g) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Insurance" shall mean:  all insurance policies covering any or all of the Collateral (regardless of whether the Lender is the loss payee thereof).

"Interest Payment Date": (a) the last day of each calendar month and (b) the date of any repayment or prepayment made in respect thereof.

"Interest Rate": eight percent (8.0%) per annum based on 360-day year.

#12148565 v3 (999921.2003)

"Interim Order": an order or orders of the Bankruptcy Court entered in the Case, after notice given and a hearing conducted in accordance with Bankruptcy Rule 4001(c), authorizing and approving the transactions contemplated by this Agreement and granting the Superpriority Claims described in the recitals above and Section 2.12 hereof in favor of the Lender, in the form of Exhibit A or otherwise in form and substance satisfactory to the Lender in its absolute discretion.

"Investment": the meaning set forth in Section 6.6 hereof.

"Lender": the meaning set forth in the preamble to this Agreement.

"Lien": with respect to any Property, any mortgage, lien (statutory or other), pledge, charge, hypothecation, assignment, deposit arrangement, security interest, encumbrance or other security agreement or preferential arrangement of any kind or nature in respect of such Property.

"Loan": the meaning set forth in Section 2.1 hereof.

"Loan Documents": this Agreement, the Note(s) and any other instrument or agreement executed and delivered in connection herewith.

"Material Adverse Effect": a material adverse effect on (a) the Property, business, operations and/or financial condition of the Borrowers taken as a whole, in each case, other than such effects as result solely from the commencement of the Cases or the existence of pre-petition claims and of defaults under such pre-petition claims, (b) the validity or enforceability of the Orders or any of the Loan Documents, (c) the rights and remedies of the Lender under the Orders and the Loan Documents or (d) timely payment of the principal of or interest on the Loans or other amounts payable in connection therewith.

"Maturity Date": June 30, 2010.

"Money" shall mean "money" as defined in the UCC.

"Net Cash Proceeds": in connection with any Asset Sale the proceeds thereof in the form of cash and cash equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received) of such Asset Sale, net of reasonable attorneys', brokers', accountants' and investment banking fees directly related thereto, and other reasonable customary fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements).

"Non-Excluded Taxes": the meaning set forth in Section 2.10 hereof.

"Note": the meaning set forth in Section 2.5(d) hereof.

"Obligations": (a) the principal of and interest on the Loans and the Notes, (b) the Fees and all other present and future, fixed or contingent, obligations and liabilities (monetary or otherwise) of the Borrowers to the Lender under the Loan Documents, including, without limitation, all costs and expenses payable pursuant to <u>Section 9.6</u>.

"Orders": the Interim Order and the Final Order.

"Other Facilities": off-balance sheet financings with limited recourse to the Borrowers from other financial institutions.

"Permitted Liens": Liens permitted to exist under <u>Section 6.2</u> hereof.

"Person": any natural person, corporation, division of a corporation, partnership, trust, joint venture, association, company, estate, unincorporated organization or government or any agency or political subdivision thereof.

"Petition Date": the meaning set forth in the recitals.

"Proceeds": (i) all "proceeds" as defined in Article 9 of the UCC, (ii) payments or distributions made with respect to any Investment Related Property and (iii) whatever is receivable or received when Property or proceeds are sold, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

"Property": any right or interest of Borrowers in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation all property of the Borrowers' bankruptcy estates under Bankruptcy Code section 541, Accounts Receivable, Agreements, cash, cash equivalents, securities, claims, causes of action, Chattel Paper, Documents, Money, equity rights, Equipment, Goods, Inventory, Instruments, Intellectual Property, Investment Related Property, Insurance, General Intangibles, Receivables and Records.

"Register": a ledger maintained by the Lender to record the occurrence of any transactions made in accordance with this Agreement.

"Reorganization Plan": any plan proposed in the Cases under chapter 11 of the Bankruptcy Code.

"Requirements of Law": as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitration or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Responsible Officer": as to the Borrowers, the president, the chief executive officer, the chief financial officer, the chief restructuring officer, or any officer at the level of vice president or higher but with respect to financial matters, the chief financial officer or chief restructuring officer.

#12148565 v3 (999921.2003)

"Schedules" the schedules of Borrowers filed in the Cases pursuant to Federal Rule of Bankruptcy Procedure 1007.

"Subsequent Loan": each Loan made after the Closing Date and following the first Loan.

"Superpriority Claim": a claim against the Borrowers in the Cases which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code including a claim pursuant to Section 364(c)(1) of the Bankruptcy Code.

"Supporting Obligation" shall mean all "supporting obligations" as defined in Article 9 of the UCC.

"Tax Code" shall mean the United States Internal Revenue Code of 1986, as amended from time to time.

"Termination Date": the earliest to occur of (a) the Maturity Date, (b) the date of indefeasible prepayment in full by the Borrowers of the Loans and the permanent termination of the Commitment, (c) forty (40) days following the Petition Date if the Final Order has not been entered by the Bankruptcy Court, (d) the date of entry of an order dismissing either or both of the Cases or converting either or both of the Cases to cases under Chapter 7 of the Bankruptcy Code, (e) the date of entry of a Confirmation Order in the Cases or either of them (or, if such order is effective on a subsequent date, the date of its effectiveness), (f) the date of the consummation of a sale of all or substantially all of the Borrowers' assets pursuant to Section 363 of the Bankruptcy Code, (g) the date of occurrence of an Event of Default under Section 7.1(a) hereof; (h) five (5) days following the date on which the Lender gives notice of the occurrence of an Event of Default pursuant to any of Section 7.1(b) through Section 7.1(s) hereunder if such default is not earlier remedied, (i) the date of entry of any order granting relief from the automatic stay with respect to any Liens (or, if such order is effective on a subsequent date, the date of its effectiveness), (j) the date of entry of an order appointing a trustee or examiner in either or both of the Cases, or (k) the date of commencement of any action by the Borrowers or anyone acting by, through, for or under right of the Borrowers' bankruptcy estates, against the Lender or any of its Affiliates (other than the Borrowers).

"Transferee": the meaning given such term in Section 9.7(c) hereof.

"UCC": the Uniform Commercial Code as in effect from time to time in the State of Delaware or, when the context implies, the Uniform Commercial Code as in effect from time to time in any other applicable jurisdiction.

"Weekly Reporting Certificate" means the certificates required pursuant to Section 5.1(b) hereof.

1.2. <u>Terms Generally</u>. The definitions in Section 1.1 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. All references

herein to Sections, Exhibits and Schedules shall be deemed references to Sections and subsections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. The use herein of the word "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. Except as otherwise provided herein, the rules of construction applicable to provisions of the Bankruptcy Code under 11 U.S.C. § 102 shall apply to the provisions of this Agreement.

1.3. <u>Accounting Terms</u>. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time.

1.4. <u>Computation of Time</u>. In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including." Except as otherwise provided herein, all dates, deadlines, and other provisions computing time herein shall be interpreted in accordance with Fed. R. Bankr. P. 9006 as that rule was in effect on the Petition Date.

## SECTION 2
## AMOUNT AND TERMS OF LOANS

2.1. <u>Loan Commitment</u>. Subject to the terms and conditions hereof, the Lender agrees to make term loans (each, a "Loan" and, collectively, the "Loans") to the Borrowers from time to time during the Commitment Period, but not more often than once weekly, in an aggregate principal amount at any one time outstanding which does not exceed the amount of the Commitment then in effect at such time. During the Commitment Period, the Borrowers may use the Commitment by borrowing and prepaying the Loans in whole or in part, all in accordance with the terms and conditions hereof. Any amount borrowed under this <u>Section 2.1</u> and subsequently repaid or prepaid may not be re-borrowed. All amounts owed hereunder with respect to the Loans shall be paid in full no later than the Maturity Date.

2.2. <u>Intentionally Omitted</u>.

2.3. <u>Requesting and Funding of Loans</u>. The Borrowers may borrow under the Commitment during the Commitment Period on any Business Day, provided that the conditions precedent specified in <u>Section 4.2</u> hereof shall be satisfied or waived and the Borrowers shall give the Lender irrevocable notice (which notice must be received by the Lender prior to 12:00 noon, Delaware time) not fewer than two (2) Business Days prior to the requested Borrowing Date, which notice shall specify (i) the amount to be borrowed and (ii) the requested Borrowing Date. The Lender shall make the proceeds of any such Loan available to Borrowers on such Borrowing Date by causing an amount of same day funds in Dollars to be wired to the General

Account of the Borrowers from the Lender, its Affiliates, or any other third party. In no event shall the aggregate amount of the Loans exceed $371,964.00, and unless the Lender consents otherwise, in no event shall amounts borrowed at any time exceed the Borrowers' anticipated cash needed for the ensuing week as reflected in the Budget (subject to a 10% variance).

2.4. <u>Use of Proceeds</u>. The Borrowers shall apply the proceeds of the Loans solely (i) to pay the costs, expenses and fees required to be paid by the Borrowers under this Agreement, and (ii) to meet the Borrowers' actual cash funding needs in compliance with the Budget. No line item representing any expense incurred or disbursement made by the Borrowers shall be more than ten percent (10%) at variance from the amount of such line item as set forth in the Budget without approval of the Lender. To the extent that any funds are borrowed hereunder but not used for the purposes borrowed, the Borrowers shall retain such funds for use in accordance with the Budget, subject to the provisions of this Agreement.

2.5. <u>Repayment of Loans; Evidence of Debt</u>.

(a) The Borrowers hereby unconditionally promise to pay to the Lender the then unpaid principal amount of each Loan on the Termination Date. The Borrowers hereby further agree to pay interest on the unpaid principal amount of the Loans from time to time outstanding from the date hereof until payment in full thereof at the rates per annum set forth in <u>Section 2.6</u> hereof.

(b) The Lender shall record in the Register (i) the amount and Borrowing Date of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to the Lender hereunder, and (iii) the amount of any payment received by the Lender hereunder from the Borrowers.

(c) The Lender shall make the Register available for inspection by the Borrowers during business hours upon reasonable notice. The failure of the Lender to maintain the Register, or any error therein, shall not in any manner affect the obligation of the Borrowers to repay (with applicable interest) the Loans in accordance with the terms of this Agreement.

(d) The Borrowers agree that, upon request by the Lender, the Borrowers will execute and deliver to the Lender a promissory note, dated as of the Closing Date or the date of any Loan in order to evidence the existence and amount of such Loan(s), substantially in the form of <u>Exhibit B</u> with appropriate insertions as to date and principal amount (each a "Note" and collectively, the "Notes"). In the event of any inconsistency between any Note(s) and this Agreement, the terms of this Agreement shall govern.

2.6. <u>Interest Rate and Payment Dates</u>.

(a) Each Loan shall bear interest for each day at the Interest Rate.

(b) If all or a portion of (i) any principal of any Loan, (ii) any interest payable thereon, or (iii) any other amount payable hereunder, including applicable Fees, shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), the principal of the Loans and any such overdue interest or other amount shall bear interest at the Interest Rate

plus five percent (5%) per annum, in each case from the date of such non-payment until such overdue principal, interest or other amount is paid in full (as well after as before judgment).

(c)     Interest shall accrue and be payable in arrears on the Termination Date provided that interest accruing pursuant to paragraph (b) of this subsection shall be payable from time to time on demand.

2.7.  Computation of Interest. Interest shall be calculated on the basis of a 360-day year for the actual days elapsed.

2.8.  Optional Prepayment. The Borrowers may at any time, without premium or penalty (but without impairing rights of Lender under Section 2.12), in whole or in part prepay any Loans, and the Commitment shall be permanently terminated or reduced, in whole or in part by such amount prepaid.

2.9.  Mandatory Prepayment; Commitment Reduction.

(a)     Within one (1) Business Day after the receipt by the Borrowers of any Net Cash Proceeds, the Borrowers shall apply such Net Cash Proceeds, up to the amount of Loans outstanding, to the prepayment of any outstanding Loans.

(b)     On the date of receipt by the Borrowers of any cash proceeds from the incurrence of any Indebtedness of Borrowers (other than with respect to any advances hereunder, under any of the Notes, or under any Indebtedness permitted to be incurred pursuant to Section 6.1 hereof) the Borrowers shall prepay the Loans in an aggregate amount equal to one hundred percent (100%) of such proceeds, net of reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(c)     Upon the Termination Date, the Borrowers shall pay the Loans in full (including all accrued and unpaid interest thereon, Fees, and other Obligations in respect thereof), and the Commitment shall be permanently terminated.

2.10.  Taxes. All payments made by the Borrowers under this Agreement and the Note shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp, or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on the Lender as a result of a present or former connection between the Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any Note). If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("Non-Excluded Taxes") are required to be withheld from any amounts payable to the Lender hereunder or under any Note, the amounts so payable to the Lender shall be increased to the extent necessary to yield to the Lender (after payment of all taxes) an amount equal to the sum it would have received had no such

withholdings been made. Whenever any Non-Excluded Taxes are payable by the Borrowers and such Borrowers have received notice thereof, as promptly as possible thereafter the Borrowers shall send to the Lender a certified copy of an original official receipt received by such Borrowers showing payment thereof or other evidence of payment reasonably satisfactory to the Lender. If, after the Borrowers have been notified of an obligation to pay Non-Excluded Taxes, the Borrowers fail to pay any Non-Excluded Taxes when due to the appropriate taxing authority or fails to remit to the Lender the required receipts or other required documentary evidence, the Borrowers shall indemnify the Lender for any incremental taxes, interest or penalties that may become payable by the Lender as a result of any such failure. The agreements in this subsection shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.11.  Nature of Fees. All Fees shall be paid on the earlier of the date of (i) any Loan hereunder and (ii) twenty (20) days after invoice therefrom by Lender, in immediately available funds to the Lender as provided herein. Once paid, none of the Fees shall be refundable under any circumstances. Further, all reasonable attorney's fees and expenses, other professional fees and reasonable out of pocket expenses of the Lender associated with the Loans shall be obligations of and paid by the Borrowers and enjoy the protections of the Superpriority Claims provided for herein.

2.12.  Superpriority Claim.   The Borrowers hereby covenant, represent and warrant that, upon entry of the Interim Order (and the Final Order, as applicable), the Obligations of such Borrowers hereunder and under the other Loan Documents and the Orders, pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed Superpriority Claims, subject and subordinate only to the payment (as the same may be due and payable) of (x) the accrued professional fees and disbursements allowed by order of the Bankruptcy Court and incurred prior to the date of an Event of Default by (1) the professionals retained by the Borrowers under section 327(a) and (e) of the Bankruptcy Code, and (2) the professionals retained under section 1103(a) of the Bankruptcy Code by any statutory committee of unsecured creditors appointed in these cases, in an aggregate amount not to exceed the aggregate amount budgeted for the fees and expenses of such professionals for the period from the Petition Date to the date of an Event of Default, less retainers held by any such professionals as of the Petition Date; (y) the sum of $5,000.00 for the aggregate post-Event of Default fees and expenses of Pinckney, Harris & Weidinger, LLC (the "Post-Default Fee"), to be funded as provided in Section 7.2 hereof; and (z) the payment of unpaid statutory fees owed to the United States Trustee and any fees payable to the Clerk of the Bankruptcy Court ((x), (y) and (z) collectively, the "Carve-Out"). The Lender agrees that so long as no Event of Default shall have occurred and be continuing, the Borrowers shall be permitted to pay compensation and reimbursement of expenses allowed and payable under Sections 330 and 331 of the Bankruptcy Code, as the same may be payable, with the amounts so paid reducing the Carve-Out.

2.13.  Payment of Obligations. Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, the Lender shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

#12148565 v3 (999921.2003)

2.14.  No Discharge; Survival of Claims. The Borrowers agree that to the extent their Obligations hereunder are not satisfied in full, except as otherwise agreed by the Lender, (a) their Obligations arising hereunder shall not be discharged by the entry of a Confirmation Order or Discharge Order (and the Borrowers, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge) and (b) the Superpriority Claim granted to the Lender pursuant to the Orders and described in Section 2.12 hereof shall not be affected in any manner by the entry of a Confirmation Order or Discharge Order.


SECTION 3
REPRESENTATIONS AND WARRANTIES

In order to induce the Lender to make Loans hereunder, the Borrowers represent and warrant as follows:

3.1.  Execution; Binding Obligation. Upon entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), this Agreement has been duly executed and delivered by the Borrowers. This Agreement is, and each of the other Loan Documents to which the Borrowers are or will be a party, when delivered hereunder or thereunder, will be, a legal, valid and binding obligation of the Borrowers enforceable against the Borrowers in accordance with its terms and the Orders, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

3.2.  Budget. The Borrowers have furnished the Lender with a copy of the Budget which has been prepared by the Borrowers. The Budget is based upon estimates and assumptions and information the Borrowers believe to be reasonable and fair in light of current conditions and current facts known to the Borrowers and, as of the Closing Date, reflects the Borrowers' good faith and reasonable estimates of the future financial performance and financing needs of the Borrowers. The Borrowers have no reason to believe that the information in the Budget is incorrect or misleading in any material respect.

3.3.  Approvals. Except for the Orders, no Authorizations of any Governmental Authority are necessary for the execution, delivery or performance by the Borrowers of the Loan Documents, or for the legality, validity or enforceability hereof or thereof.

3.4.  The Orders. As of the date of the making of the Initial Loan hereunder, the Interim Order has been entered and has not been stayed, amended, vacated, reversed, rescinded or otherwise modified in any respect. As of the date of the making of any Subsequent Loan hereunder, the Interim Order and/or the Final Order, as the case may be, have been entered and have not been stayed, amended (except in accordance with the terms hereof or as consented to by the Lender), reversed, vacated, rescinded or otherwise modified (except in accordance with the terms hereof or as consented to by the Lender) in any respect.

-12-

3.5. <u>Material Adverse Change</u>. Since the Closing Date, there has occurred no event, act or condition which has had, or could have, a Material Adverse Effect.

3.6. <u>No Default</u>. No Default or Event of Default exists.

SECTION 4
CONDITIONS PRECEDENT

4.1. <u>Conditions to Borrowing</u>. The obligation of the Lender to make any Loan is subject to the satisfaction, immediately prior to or currently with the making of such Loan of the following conditions precedent, unless the Lender has previously waived any such condition precedent in writing:

(a) <u>Loan Documents</u>. The Lender shall have received (i) this Agreement, executed and delivered by a duly authorized officer of the Borrowers, (ii) a Note conforming to the requirements hereof and executed by a Responsible Officer of the Borrowers, and (iii) such other documents, including without limitation, security agreements, pledge agreements and other relative collateral documents, in form and substance satisfactory to the Lender in its absolute discretion.

(b) <u>Approvals and Consents</u>. All requisite material governmental authorities and third parties shall have approved or consented to the transactions contemplated hereby to the extent required, all applicable appeal periods shall have expired and there shall be no governmental or judicial action, actual or threatened, that could reasonably be expected to restrain, prevent or impose burdensome conditions on the transactions contemplated hereby.

(c) <u>Final Order</u>. Any obligations of the Lender hereunder shall be conditioned on the entry of a final, non-appealable Order, in form and substance acceptable to the Lender in its absolute discretion, containing the findings and conclusions of law required by 11 U.S.C. §§ 363 and 364 and stated in paragraph (d) below.

(d) <u>Interim Order</u>. Before the time of the making of the first Loan the Lender shall have received a certified copy of the Interim Order approving the Loan Documents and granting the Superpriority Claim status described in <u>Section 2.12</u> hereof and finding that the Lender is extending credit to the Borrowers in good faith within the meaning of Section 364(e) of the Bankruptcy Code, which Interim Order (i) shall be in form and substance acceptable to the Lender in its absolute discretion, (ii) shall approve the payment by the Borrowers of all Fees, (iii) shall have been entered upon an application of the Borrowers reasonably satisfactory in form and substance to the Lender, (iv) shall be in full force and effect and (v) shall not have been stayed, reversed, vacated, rescinded, modified or amended in any respect and, if the Interim Order is the subject of a pending appeal in any respect, none of the making of such Loan, the grant of Superpriority Claims to Lender or the performance by the Borrowers of any of their obligations hereunder or under the other Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

-13-

(e)     Cash Collateral. Before the time of the making of the Initial Loan , and in any event no later than ten (10) days after the Petition Date, the Lender shall have received a copy of an order or orders of the Bankruptcy Court, in form and substance reasonably satisfactory to the Lender, which may be the Interim Order, pursuant to Section 363(c)(2)(B) of the Bankruptcy Code, authorizing the use by the Borrowers of any Cash Collateral, which order(s) shall be in full force and effect and shall not have been stayed, reversed, vacated, rescinded, modified or amended in any respect without the prior written consent of the Lender.

(f)     First Day Orders. All orders submitted to the Bankruptcy Court on or about the Petition Date shall be in form and substance reasonably satisfactory to the Lender and the Lender shall be reasonably satisfied with any Cash Collateral arrangements applicable to any pre-Petition Date secured obligations of the Borrowers.

(g)     Payment of Fees; Expenses. The Borrowers shall have paid to the Lender the then unpaid balance of all accrued and unpaid Fees owed under and pursuant to this Agreement or the Interim Order and all expenses for which invoices have been presented (including reasonable fees, disbursements and other charges of counsel and other advisors to the Lender (being Pepper Hamilton LLP as of the Closing Date) on or before the Closing Date. All such amounts will be paid with proceeds of Loans made on the Closing Date and will be reflected in the funding instructions given by the Borrowers to the Lender on or before the Closing Date.

(h)     Budget. The Lender shall have received and approved, in Lender's sole discretion, the initial budget for the period as of the Petition Date through May 31, 2010, and as to Loans after the first Loan, the budget for the period commencing on the date of such Loan and covering the thirteen week period thereafter (or such other period as Lender and Borrowers may agree), which shall include, without limitation, an income statement and cash flow statement that itemizes on a weekly basis for such period all revenues projected to be received, all material expenditures and disbursements proposed to be made prior to the end of such period, and all projected Loans to be requested pursuant to this Agreement, in form and substance satisfactory to the Lender (all the foregoing collectively, the "Budget").

(i)     No Material Adverse Change. No event, act or condition shall have occurred in the business, assets, operations or Properties of the Borrowers which, in the judgment of the Lender, has had or would have a Material Adverse Effect.

(j)     No Injunction. No law or regulation shall have been adopted, no order, judgment or decree of any Governmental Authority shall have been issued, and no litigation shall be pending or threatened, which n the judgment of the Lender would enjoin, prohibit or restrain, or impose or result in the imposition of any material adverse condition upon, the making or repayment of the Loans.

(k)     Additional Matters. All corporate and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated by this Agreement, shall be reasonably satisfactory in form and substance to the Lender, and the

Lender shall have received such other documents in respect of any aspect or consequence of the transactions contemplated hereby or thereby as it shall reasonably request.

4.2. <u>Conditions to Subsequent Loans</u>. The obligation of the Lender to make each Subsequent Loan is also subject to the following conditions precedent, unless the Lender has previously waived any such condition precedent in writing:

(a) <u>Notice; Borrowing Certificate</u>. The Lender shall have received a Borrowing Certificate, which shall constitute notice under <u>Section 2.3</u> hereof, executed by a Responsible Officer of the Borrowers, certifying that (i) the requested Loan and the intended use thereof are consistent with the terms of this Agreement (including the Budget) and is necessary, after utilization and application of the available cash, in order for such Borrowers to satisfy its obligations in the ordinary course of business or as otherwise permitted under this Agreement, (ii) the proceeds of all prior Loans have been applied in conformity with the requirements of this Agreement (including the Budget), (iii) all of the representations and warranties contained in <u>Section 3</u> hereof are true and correct as required by <u>Section 4.2(b)</u> hereof, (iv) the making of the requested Loan is in compliance with <u>Section 4.2(a)</u> and <u>Section 2.1</u> hereof, and (v) such Responsible Officer has no knowledge of any Default or Event of Default.

(b) <u>Representations and Warranties</u>. All representations and warranties contained in or pursuant to this Agreement and the other Loan Documents, or otherwise made in writing in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of each Loan hereunder with the same effect as if made on and as of such date (unless stated to relate to a specific earlier date, in which case, such representations and warranties shall be true and correct in all material respects as of such earlier date).

(c) <u>No Default or Event of Default</u>. No Default or Event of Default shall have occurred and be continuing on such Borrowing Date or after giving effect to such Loan on such Borrowing Date.

(d) <u>Governmental Approvals</u>. All governmental approvals required at such Borrowing Date shall have been received and shall be in full force and effect and all conditions to such approvals shall have been satisfied.

(e) <u>Material Adverse Change</u>. Since the Petition Date there shall not have been any material adverse change or any development involving a prospective adverse change in or affecting the assets, general affairs, management, financial position, or operations of the Borrowers.

(f) <u>Bankruptcy Court Approval</u>. The Interim Order shall be in full force and effect and shall not have been stayed, reversed, vacated, rescinded, or, without the consent of the Lender, modified (other than by the Final Order) or amended in any respect or, if the date of such requested Loan is more than forty (40) days after the Petition Date, a non-appealable Final Order shall have been entered, which Final Order shall be in full force and effect and shall not have been stayed, reversed, vacated, rescinded or, without the consent of the Lender, modified or amended in any respect and, if the Interim Order, is the subject of a pending

#12148565 v3 (999921.2003)

appeal in any respect, none of the making of such Loan, the grant of Superpriority Claims to Lender or the performance by the Borrowers of any of their obligations hereunder or under the Loan Documents or under any other instrument or agreement referred to herein or therein shall be the subject of a then effective stay pending appeal.

(g)  Pleadings. No pleading shall have been filed in the Cases by any party which is not withdrawn, dismissed or denied within thirty (30) days after such filing seeking (i) to dismiss or convert either or both of the Cases to cases under Chapter 7 of the Bankruptcy Code, (ii) the appointment of a Chapter 11 trustee in either or both of the Cases, (iii) the appointment of an examiner having enlarged powers relating to the operation of the business of the Borrowers (beyond those set forth under Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, (iv) the allowance of a Superpriority Claim *pari passu* or senior to that of the Lender granted pursuant to the collateral documents, (v) the granting or imposition of a Lien on any material property or assets of the Borrowers, other than a Lien that existed on the Petition Date (and only to the extent that it existed on the Petition Date), (vi) to stay, reverse, vacate, or otherwise modify the Interim Order or the Final Order without the prior written consent of the Lender, or (vii) relief from the automatic stay so as to allow a third party to proceed against any material property or assets of the Borrowers (it being understood and agreed that this condition precedent shall not be operative until the end of said 30-day period unless, prior thereto, any of the foregoing relief is granted).

(h)  Budget. Since the Petition Date, the Borrowers shall have operated pursuant to the Budget, and no line item representing any expense incurred or disbursement made by the Borrowers shall be more than ten percent (10%) at variance from the amount of such line item as set forth in the Budget.

(i)  Payment of Fees. The Borrowers shall have paid to the Lender the then unpaid balance of all accrued and unpaid Fees, expenses, and other amounts then due and payable under and pursuant to this Agreement or the Orders.

(j)  Reorganization Plan. There shall not have been filed in the Cases any Reorganization Plan that does not provide for the indefeasible payment to Lender of all Obligations in full, in cash, on the effective date thereof.

(k)  Cash Management System. The Borrowers shall have implemented and continue to maintain a cash management system (including without limitation, the General Account) reasonably satisfactory to the Lender.

(l)  Financial Reporting. The Lender shall have received the timely delivery of the financial reports required to be delivered hereunder.

The request by the Borrowers for, and the acceptance by the Borrowers of, each Loan hereunder shall be deemed to be a representation and warranty by the Borrowers that the conditions specified in this Section 4.2 have been satisfied or waived at that time.

## SECTION 5
## AFFIRMATIVE COVENANTS

The Borrowers hereby agree that, so long as any Loan remains outstanding and unpaid or any other amount is owing to the Lender hereunder or under any other Loan Document, the Borrowers shall (unless otherwise agreed by the Lender):

5.1. <u>Reporting.</u> Deliver to the Lender:

(a)     as soon as available, but in any event not later than thirty (30) days after the end of each, a copy of the monthly operating report required to be provided to the United States Trustee for the immediately preceding month.

(b)     on the Wednesday of each week following the Closing Date, (i) a rolling 13-week forecast, (ii) a comparison of actual cash flows for the preceding week to the cash flows forecasted in the Budget for such week showing the variance, if any, of the actual cash flows from the Budget, with an explanation of any significant variance, (iii) a comparison of actual cumulative cash flows to the cash flows forecasted in the Budget for such period showing the variance, if any, of the actual cash flows from the Budget, with an explanation of any significant variance to the Budget, accompanied by a certificate of a Responsible Officer of the Borrowers stating that such forecast and reconciliations are based upon reasonable estimates and assumptions and information that is accurate to the best knowledge of such Responsible Officer and that such Responsible Officer has no reason to believe that such forecast and reconciliations are incorrect or misleading in any material respect.

(c)     to counsel to the Lender, promptly after the same is available, copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Borrowers with the Bankruptcy Court or the United States Trustee in the Cases, or distributed by or on behalf of the Borrowers to any official committee appointed in the Cases; and

(d)     promptly upon request, such other information (financial or otherwise) as may be reasonably requested by the Lender.

5.2. <u>Payment of Obligations.</u> Except as otherwise prohibited by the Bankruptcy Code or by an applicable order of the Bankruptcy Court, and unless a Default or Event of Default has occurred hereunder, pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, (i) all their material obligations of whatever nature that constitute administrative expenses under Sections 503(b) and 507(a) of the Bankruptcy Code in the Cases, except, so long as no material Property (other than money for such obligation and the interest or penalty accruing thereon) of the Borrowers is in danger of being lost or forfeited as a result thereof, no such obligation need be paid if the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of such Borrowers, as the case may be and (ii) all obligations arising prepetition permitted to be paid postpetition but prior to confirmation of a

Reorganization Plan by order of the Bankruptcy Court that has been entered with the consent of (or non-objection by) the Lender.

5.3. <u>Maintenance of Existence; Compliance With Contractual Obligations and Requirements of Law</u>. (i) Preserve, renew, and keep in full force and effect their existence and (ii) take all reasonable action to maintain all rights, privileges and franchises reasonably necessary or desirable in the normal conduct of their business except as otherwise permitted hereby and, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect, and subject to the effect of the Cases, comply with all Contractual Obligations and Requirements of Law.

5.4. <u>Inspection of Property; Books and Records; Discussions</u>. Keep proper books of records and accounts in which full, true, and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to their business and activities; and permit representatives of the Lender to visit and inspect any of their Property and examine and make abstracts from any of its books and records at any reasonable time or times and to discuss the business, operations, Property and financial and other condition of the Borrowers with officers and employees of the Borrowers and with their present and former independent certified public accountants.

5.5. <u>Notices</u>. Promptly, and in any event within three Business Days after a Responsible Officer becomes aware thereof, give written notice to the Lender of:

(a)     the occurrence of any Default or Event of Default;

(b)     any (i) default or event of default under any post-Petition Date Contractual Obligation of the Borrowers or (ii) litigation, investigation or proceeding which may exist at any time between the Borrowers and any Governmental Authority, which in either case, if not cured or if adversely determined, as the case may be, could reasonably be expected to have a Material Adverse Effect;

(c)     any post-Petition Date litigation or proceeding affecting the Borrowers (i) an adverse determination of which could reasonably be expected to have a Material Adverse Effect or (ii) in which injunctive or similar relief is sought; and

(d)     any development or event which has had or would reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this subsection shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the Borrowers have taken or propose to take with respect thereto.

5.6. <u>Collateral Audit</u>. Permit employees, representatives and/or agents of the Lender, at any time upon the Lender's reasonable  request, during normal business hours, to enter into the premises of the Borrowers to conduct an audit, the reasonable cost and expense of which will be borne by the Borrowers, of the assets of such Borrowers and that comprise the Collateral.

5.7. <u>Payment of Taxes</u>. Unless prohibited by the Bankruptcy Code, pay and discharge all taxes, assessments and governmental charges or levies imposed upon them or upon their income or profits, or upon any of their Properties, prior to the date on which penalties attach thereto, and all lawful claims for sums that have become due and payable which, if unpaid, might become a Lien not otherwise permitted under <u>Section 6.2</u> hereof.

5.8. <u>Further Assurances</u>. At the cost and expense of the Borrowers, execute and file all such further documents and instruments, and perform such other acts, as the Lender may reasonably determine are necessary or advisable to maintain the priority of the Superpriority Claims or otherwise give effect to the protections afforded Lender under this Agreement.

5.9. <u>Approval of this Agreement</u>. Use their best efforts to obtain approval from the Bankruptcy Court of this Agreement.

5.10. <u>Cooperation with Consultants</u>. Assist and cooperate with representatives of such consulting firm as may be retained by the Lender or its counsel from time to time, acting on behalf of the Lender, in their review of the preparation and presentation of the financial statements and other information of the Borrowers delivered to the Lender pursuant hereto, and in their performance of such other tasks as directed by the Lender or its counsel.

5.11. <u>Sharing of Information</u>. Immediately deliver to the Lender any and all non-privileged documentation relating to a solicitation, offer, or proposed disposition of any material amount of Property, including but not limited to, letters of inquiry, solicitations, letters of intent or asset purchase agreements.


## SECTION 6
## NEGATIVE COVENANTS

The Borrowers hereby agree that, so long as any Loan remains outstanding and unpaid or any other amount is owing to the Lender hereunder or under any other Loan Document, the Borrowers shall not (without the Lender's written consent), directly or indirectly:

6.1. <u>Limitation on Indebtedness</u>. Create, incur, assume or suffer to exist any Indebtedness, except:

    (a)    Indebtedness under this Agreement and the other Loan Documents;

    (b)    Indebtedness outstanding on the Petition Date and listed on the Schedules but excluding the refinancing of any such Indebtedness; and

    (c)    Indebtedness provided for in the Budget (subject to a variance of up to 10%).

6.2. <u>Limitation on Liens</u>. Create, incur, assume or suffer to exist any Lien upon any of their Property, whether now owned or hereafter acquired, except for:

(a)     Liens existing on the Petition Date and listed in the Schedules;

(b)     carriers', warehousemen's, mechanics', materialmen's, repair-men's, landlords' or other similar Liens arising in the ordinary course of business which are not overdue for a period of more than sixty (60) days or which are being contested in good faith by appropriate proceedings;

(c)     pledges or deposits in connection with workers' compensation, unemployment insurance, and other social security legislation; and

(d)     Liens imposed by any Governmental Authority for taxes, assessments or charges not yet due or that are being contested in good faith and by appropriate proceedings if, unless the amount thereof is not material with respect to their financial condition, adequate reserves with respect thereto are maintained on the books of the Borrowers in accordance with GAAP as of the Petition Date.

6.3.     Limitation on Guaranty Obligations. Create, incur, assume or suffer to exist any guaranty of obligations of a third party except for guaranty obligations existing on the Petition Date.

6.4.     Prohibition on Fundamental Changes. Enter into any acquisition, merger, consolidation or amalgamation, or liquidate, wind up or dissolve themselves (or suffer any liquidation or dissolution), or convey, sell, lease, assign, transfer or otherwise dispose of, all or substantially all of their Property, business or assets or make any material change in their present method of conducting business or create or acquire any subsidiaries; provided that the Borrowers may cease operating their businesses if they determine, after consultation with the Lender, that doing so would be in the best interests of their estates.

6.5.     Limitation on Sale of Assets. Convey, sell, lease, assign, transfer or otherwise dispose of any of their Property or business (including, without limitation, Accounts and leasehold interests), whether now owned or hereafter acquired, except the sale, lease or other disposition of Property in the ordinary course of business.

6.6.     Limitation on Investments, Loans and Advances. Make any advance, loan, extension of credit, or capital contribution to, or purchase any stock, bonds, notes, debentures or other securities of or any assets constituting a business unit of, or make any other investment (each, an "Investment") in, any Person, except extensions of trade credit and prepaid expenses made in the ordinary course of business.

6.7.     Lines of Business. Engage, to any substantial extent, in any line or lines of business activity other than businesses of the same general type as those in which the Borrowers are engaged on the date of this Agreement or which are related thereto.

6.8.     Chapter 11 Claims; Payment of Pre-Petition Date Claims.

#12148565 v3 (999921.2003)

(a)     Incur, create, assume, suffer to exist or permit any other Superpriority Claim which is pari passu with or senior to the claims of the Lender granted pursuant to this Agreement and the Orders, except for the Carve-Out;

(b)     Incur, create, assume, suffer to exist or permit any Lien on any material Property of Borrowers other than Permitted Liens.

(c)     Make any payments of any obligations arising before the Petition Date other than (i) as permitted under the Orders, (ii) as permitted by the Bankruptcy Court under the "first-day" orders referred to in <u>Section 4.1(f)</u> hereof, including pre-Petition Date wages and benefits and other employee-related claims, and (iii) as otherwise permitted or required under this Agreement.

6.9.   <u>Use of Proceeds</u>. (a) Use the proceeds of the Loans for purposes other than those detailed in the Budget (subject to a 10% variance) or as described in <u>Section 2.4</u> hereof, or (b) use any portion of the Loans, the Collateral, the Carve-Out, or any Cash Collateral to commence or prosecute any action or objection with respect to the Superpriority Claims granted to the Lender pursuant to this Agreement and the Orders or to commence or prosecute any action or proceeding against Lender or any of Lender's Affiliates.

6.10.  <u>Budget</u>. Permit the amount of any line item representing an expense incurred or disbursement made by the Borrowers, for any weekly period from the Closing Date to the Maturity Date, to be more than ten percent (10%) at variance from the amount set forth for such line item in the Budget.


SECTION 7
EVENTS OF DEFAULT

7.1.   <u>Events of Default</u>. If one or more of the following events (herein called "Events of Default") shall occur and be continuing:

(a)     The Borrowers shall fail to (i) pay any principal under any Note or under this Agreement, including without limitation, pursuant to <u>Section 2.9</u> hereof, when due in accordance with the terms thereof or hereof or (ii) pay any interest on any Note or under this Agreement, or any other amount payable hereunder or under any other Loan Document, within two Business Days after any such interest or other amount becomes due in accordance with the terms thereof or hereof; or

(b)     Any representation or warranty made or deemed made by the Borrowers herein shall prove to have been incorrect in any material respect on or as of the date made or deemed made; or

(c)     The Borrowers shall default in the observance or performance of any covenant or other agreement contained in <u>Section 5.5(a)</u> or <u>Section 6</u> hereof; or

-21-

(d)     The Borrowers shall default in the observance or performance of any covenant or other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this <u>Section 7</u>), and such default shall continue unremedied for a period of five (5) days or more; or

(e)     An order shall be entered by the Court dismissing the Cases or either of them or converting the Cases or either of them to cases under Chapter 7 of the Bankruptcy Code; or

(f)     (i) An order of the Bankruptcy Court shall be entered granting another Superpriority Claim pari passu with or senior to that granted to the Lender pursuant to this Agreement and the Orders, (ii) an order of a court of competent jurisdiction shall be entered reversing, staying, vacating or rescinding either of the Orders, (iii) an order of a court of competent jurisdiction shall be entered amending, supplementing or otherwise modifying either of the Orders without the consent of the Lender, or (iv) an order of the Bankruptcy Court shall be entered granting a Lien on any material assets of the Borrowers; or

(g)     An order of the Bankruptcy Court shall be entered under Section 1106(b) of the Bankruptcy Code in the Cases or either of them appointing a trustee or examiner having enlarged powers relating to the operation of the business of the Borrowers (i.e., powers beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code); or

(h)     The Borrowers shall make any payments relating to pre-Petition Date obligations other than (i) as permitted under the Orders or the "first-day" orders or (ii) as otherwise permitted under this Agreement, including pursuant to the orders described in Section 4.1(f) hereof; or

(i)     The entry of an order granting relief from the automatic stay so as to allow any Person other than Lender to proceed against any Property of the Borrowers which has a value in excess of Five Thousand Dollars ($5,000.00) in the aggregate, other than any order permitting liquidation of a claim but not collection or an order with respect to capital or operating equipment leases that has no Material Adverse Effect; or

(j)     There shall occur any event after the Petition Date which results in, or could reasonably be expected to have, a Material Adverse Effect; or

(k)     The entry of the Final Order shall not have occurred within forty (40) days after the Petition Date; or

(l)     One or more judgments or decrees required to be satisfied as an administrative expense claim (other than claims made by or on behalf of professionals of the Borrowers or any statutory committee appointed in the Cases for allowance of compensation and/or reimbursement of out-of-pocket expenses) shall be entered after the Petition Date against the Borrowers involving in the aggregate a liability (to the extent not paid or fully covered by insurance) of $10,000 or more and all such judgments or decrees shall not have been vacated,

-22-

stayed or bonded pending appeal within the time required by the terms of such judgment or applicable law; or

(m)     Any pleading shall be filed or action commenced, whether by complaint, motion or otherwise, by the Borrowers or by any Person acting on behalf of Borrowers or their bankruptcy estates or asserting rights derivative of the Borrowers or their bankruptcy estates, asserting any claim or cause of action against Lender or any Affiliate of Lender (other than the Borrowers), except to enforce any rights of the Borrowers under this Agreement or the Orders.

(n)     Except as permitted under the Orders, any proceeding shall be commenced seeking (i) the invalidation, subordination or other challenging of the Superpriority Claims or (ii) any relief under Section 506(c) of the Bankruptcy Code; or

(o)     There shall occur (i) a material disruption in senior management of the Borrowers (including, without limitation, if Robert Katz ceases to be the Chief Restructuring Officer of the Borrowers) which is not remedied to the satisfaction of the Lender within thirty (30) days; or (ii) a Change of Control; or

(p)     Subject to Section 365 of the Bankruptcy Code, the Borrowers shall fail to obtain, maintain or comply in all material respects with any order, consent, approval, license, authorization, or validation of, or filing, recording or registration with, or exemption by, any governmental or public body or authority or any subdivision thereof; or

(q)     Borrowers shall fail to file a Reorganization Plan on or before March 31, 2010; or

(r)     There shall be filed in the Cases any Reorganization Plan that does not provide for the indefeasible payment to Lender in full, in cash, of all Obligations on the effective date thereof; or

(s)     The entry by the Bankruptcy Court of an order approving the sale, assignment, license, pledge or other transfer by the Borrowers of substantially all of the assets of the Borrowers to any Person, unless such order also provides for the indefeasible payment to Lender in full, in cash, of all unpaid Obligations at closing;

then, and in every such event and at any time thereafter during the continuance of such event and subject to the Orders, the Lender may, by notice to the Borrowers (with a copy to counsel for any statutory committee of unsecured creditors appointed in the Cases and to the United States Trustee), take one or more of the following actions, at the same or different times: (i) declare the Loans then outstanding to be forthwith due and payable, whereupon the principal of the Loans together with accrued interest thereon and any unpaid accrued Fees and all other Obligations of the Borrowers accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrowers, anything contained here or in any other

Loan Document to the contrary notwithstanding; and (ii) exercise any and all remedies under this Agreement, the Orders, and applicable law available to the Lender.

7.2. <u>Post-Default Fee</u>. Upon the occurrence of an Event of Default as a result of which the Lender declines to make further Loans to the Borrowers, or in the event the Borrowers and the Lender are unable to agree upon a further Budget providing for payment of the Borrowers' approved administrative expenses (including but not limited to professional fees and costs incurred in the ordinary course of the administration of the Borrowers' bankruptcy estates) and an Event of Default exists:

(a)    The Borrowers and the Lender agree that the Borrowers' counsel Pinckney, Harris & Weidinger, LLC ("PHW") shall be permitted, without further order of the Bankruptcy Court, to apply any retainer that PHW is holding to the Post-Default Fee as a flat fee payment for services in seeking the prompt conversion of the Cases to cases under Chapter 7 of the Bankruptcy Code and fulfilling the Borrowers' remaining routine obligations under the Bankruptcy Code and applicable rules.

(b)    To the extent that PHW is not holding sufficient funds on retainer to be applied to the entire amount of the Post-Default Fee (after applying such retainer to all other amounts owed to PHW), the Borrowers shall pay PHW the balance using funds from the Carve-Out within 5 days.

(c)    To the extent that the Borrowers are unable or unwilling to pay PHW the balance using funds from the Carve-Out, the Lender shall advance the balance (not to exceed $5,000.00) to PHW within 5 days and may, in its sole discretion, treat such payment as an additional Loan.  Once paid to PHW, such loan shall be subject to all rights, remedies, and protections of any Obligation hereunder.

## SECTION 8
## REMEDIES; APPLICATION OF PROCEEDS

8.1. <u>Remedies Upon Default</u>. Upon the occurrence and during the continuance of an Event of Default, to the extent any such action is not inconsistent with the Orders and <u>Section 7</u> hereof, the Borrowers' right to use cash collateral immediately shall cease and the Lender, in addition to any rights now or hereafter existing under applicable law, and without application to or order of the Bankruptcy Court, may, after five (5) days notice to the Borrowers and any official committee appointed in the Cases:

(a)    Take possession of all monies in the General Account for application to the Obligations, except those claims subject to the Carve-Out shall be paid by the Lender, to the extent of the Carve-Out, when they come due (including, if applicable, upon approval by the Bankruptcy Court of the applicable professional compensation and reimbursement of out-of-pocket expenses), to the extent of the monies taken by the Lender from the General Account; and

(b)     Direct the Borrowers, their estates, or any trustee that may be appointed in the Cases to sell, assign, or otherwise liquidate, any or all of the Property as instructed by Lender, and take possession of the Proceeds of any such sale, assignment or liquidation for application to, and to the extent of, the Obligations;

it being understood that the foregoing obligations are of the essence of this Agreement and that, accordingly, upon application to the Bankruptcy Court, the Lender shall be entitled to a decree requiring specific performance of such obligations by the Borrowers, their estates or any trustee that may be appointed in the Cases.

8.2. <u>Application of Proceeds</u>.     Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, upon the occurrence and during the continuance of an Event of Default, any payment by the Borrowers on account of principal of and interest on the Loans, any Net Cash Proceeds, and any other proceeds arising out of any realization upon any Property, immediately shall be applied as follows: first, to the payment of the Carve-Out; second, to the payment in full of all costs and expenses (including without limitation, reasonable attorneys' fees and disbursements) paid or incurred by the Lender in connection with any such realization upon the Collateral; and third, to the payment in full of the Loans (including any accrued and unpaid interest thereon, and any Fees and other Obligations in respect thereof).   It is understood that the Borrowers shall remain liable to the extent of any deficiency between the amounts paid to Lender pursuant to the foregoing and the amount of the Obligations.

8.3. <u>Remedies Cumulative</u>. Each and every right, power, and remedy hereby given to the Lender shall be in addition to every other right, power and remedy given under this Agreement, the Orders, the other Loan Documents, statutes, or other applicable law, now or hereafter existing at law or in equity, and each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by the Lender. All such rights, powers and remedies shall be cumulative and the exercise or the beginning of exercise of one shall not be deemed a waiver of the right to exercise of any other or others. No delay or omission of the Lender in the exercise of any such right, power or remedy and no renewal or extension of any of the Obligations shall impair any such right, power or remedy or shall be construed to be a waiver of any Default or Event of Default or an acquiescence therein. In the event that the Lender shall bring any suit to enforce any of its rights hereunder and shall be entitled to judgment, then in such suit the Lender may recover reasonable expenses, including attorney's fees, and the amounts thereof shall be included in such judgment.

8.4. <u>Discontinuance of Proceedings</u>. In case the Lender shall have instituted any proceeding to enforce any right, power, or remedy under this Agreement, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Lender, then and in every such case the Borrowers, the Lender, and each holder of any of the Obligations shall be restored to their former positions and rights hereunder, and all rights, remedies and powers of the Lender shall continue as if no such proceeding had been instituted.

#12148565 v3 (999921.2003)

# SECTION 9
# MISCELLANEOUS

9.1. <u>Amendments and Waivers</u>. Neither this Agreement, any other Loan Document to which the Borrowers are a party, nor any terms hereof or thereof may be amended, supplemented, modified, or waived except in accordance with the provisions of this Section. The Lender and the Borrowers may, from time to time, enter into written amendments, supplements, modifications or waivers for the purpose of adding, deleting, changing or waiving any provisions to this Agreement or the Notes. Any such amendment, supplement, modification or waiver shall apply to and shall be binding upon the Borrowers, the Lender, and all future holders of the Notes. In the case of any waiver, the Borrowers and the Lender shall be restored to their former position and rights hereunder and under the outstanding Notes, and any Default or Event of Default waived shall be deemed to be cured and not continuing, but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

9.2. <u>Releases</u>. The Borrowers, on behalf of themselves and their respective bankruptcy estates, release, and discharge the Lender and its Affiliates, agents, attorneys, officers, directors, and employees, and each of their respective successors and assigns, from any and all claims, demands, and causes of action of every kind and nature, whether matured or unmatured, liquidated or unliquidated, including, without limitation, any and all claims, demands, and causes of action arising out of, based upon, or related to, in whole or in part, any aspect of the prepetition relationships between the Lender and its Affiliates and the Borrowers, or any other acts or omissions of the Lender and its Affiliates, and their respective successors and assigns, in connection with their prepetition relationship with the Borrowers; provided, however, that all of the foregoing is subject to the "Third-Party Investigation Rights" set forth in the Orders.

9.3. <u>Notices</u>. All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission or similar writing) and shall be given to such party at its address or facsimile number set forth below, or at such other address or facsimile number as such party may specify from time to time for this purpose by notice to the Lender and the Borrowers. Each such notice, request or other communication shall be effective (a) if given by facsimile, when such facsimile is transmitted to the facsimile number specified below and the appropriate answer-back is received, (b) if given by mail, seventy two (72) hours after such communication is deposited in the mails with first class postage prepaid, addressed as aforesaid or (c) if given by any other means, when delivered at the address specified below; provided that notices to the Lender under Section 2 shall not be effective until received.

(a) If to Borrowers:

We The People USA, Inc.
We The People LLC
Attn: Robert D. Katz, Chief Restructuring Officer
Executive Sounding Board Associates Inc.
2 Penn Center, 1500 JFK Blvd, Suite 1730
Philadelphia, PA 19102

*rdkatz@esba.com*

With a copy to

Adam Hiller, Esquire
Pinckney, Harris & Weidinger, LLC
1220 North Market Street, Suite 950
Wilmington, DE 19801
*ahiller@phw-law.com*

(b)    If to Lender:

Thomas Morral, Vice President-Corporate Finance
Dollar Financial Group, Inc.
1436 Lancaster Ave., Suite 300
Berwyn, PA 19312

with a copy to:

Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 N. Market Street
Wilmington, DE 19801
Attn: David M. Fournier
Facsimile: 302-421-8390

9.4.  <u>No Waiver</u>. No failure or delay on the part of the Lender or any holder of a Note in exercising any right, power, or privilege hereunder or under any other Loan Document and no course of dealing between the Borrowers and the Lender or the holder of any Note shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof of the exercise of any other right, power or privilege hereunder or thereunder. No notice to or demand on the Borrowers in any case shall entitle the Borrowers to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Lender to take any other or further action in any circumstances without notice or demand.

9.5.  <u>Survival of Representations and Warranties</u>. All representations and warranties made herein and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the Notes.

9.6.  <u>Payment of Expenses</u>. The Borrowers agree (a) to pay or reimburse the Lender for all of Lender's out-of-pocket costs and expenses reasonably incurred in connection with the preparation and execution of, any amendment to, and the enforcement or preservation of any rights under, this Agreement, the Notes, the other Loan Documents and the Orders, and the consummation and administration of the transactions contemplated hereby and thereby,

-27-

including, without limitation, the reasonable fees and disbursements of counsel to the Lender, (b) to pay or reimburse the Lender for all its costs and expenses reasonably incurred in connection with the enforcement or preservation of any rights under this Agreement, the Notes, the other Loan Documents, the Orders and any such other documents following the occurrence and during the continuance of a Default or an Event of Default, including, without limitation, the reasonable fees and disbursements of counsel to the Lender and any other professionals engaged by the Lender, (c) to pay all the actual and reasonable expenses of the Lender related to this Agreement, the other Loan Documents, the Orders or the Loans in connection with the Cases (including, without limitation, the ongoing monitoring of and participation in the Cases by the Lender, including attendance by Lender's counsel at hearings or other proceedings and the ongoing review of documents filed with the Bankruptcy Court) and (d) to pay, indemnify, and hold harmless the Lender (and its directors, members, managers, executives, officers, employees and agents) from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance, preservation of rights and administration of this Agreement, the Notes, the other Loan Documents, the Orders, or the use of the proceeds of the Loans (all the foregoing in this clause (d), collectively, the "indemnified liabilities"), provided, that the Borrowers shall have no obligation hereunder to the Lender with respect to indemnified liabilities determined by the final judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Lender.

9.7. <u>Successors and Assigns; Participation; Assignments</u>.

(a) <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the Borrowers, the Lender, all future holders of the Notes, and their respective successors and assigns.

(b) <u>Assignments</u>. The Lender may, in accordance with applicable law, at any time assign to any other Person (each an "Assignee") all or any part of any Note held by the Lender, any Commitment of the Lender and or any other interest of the Lender hereunder ("Credit Exposure"). The Borrowers and the Lender agree that to the extent of any assignment the Assignee shall be deemed to have the same rights and benefits under the Loan Documents and the same rights of setoff as the Lender hereunder; provided that the Borrowers shall be entitled to continue to deal solely and directly with the Lender in connection with the interests so assigned to the Assignee unless and until such Assignee acquires all of Lender's Credit Exposure.

(c) <u>Disclosure of Information</u>. The Borrowers authorize the Lender to disclose to any Assignee (each, a "Transferee") and any prospective Transferee any and all financial and other information in the Lender's possession concerning the Borrowers which has been delivered to the Lender by the Borrowers pursuant to this Agreement. Notwithstanding the foregoing, to the extent that the Lender has acquired, or may be able to acquire, privileged information belonging to the Borrowers solely as a result of any employees, officers, directors, consultants, or other agents of the Borrowers that are also employees, officers, directors, consultants, or agents of the Lender, the Lender shall not disclose such privileged information to

any Transferee or any prospective Transferee without the consent of the Borrowers or an order of the Bankruptcy Court.

9.8. <u>Right of Setoff</u>. Subject to (i) the Carve-Out and (ii) the giving of the notice as described in <u>Section 7</u> hereof, notwithstanding the provisions of Section 362 of the Bankruptcy Code and any other rights and remedies of the Lender now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default, the Lender is hereby (subject to entry of the Interim Order) authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to the Borrowers or to any other Person, any such notice being hereby expressly waived, to set off any other indebtedness or other obligation at any time held or owing by the Lender to or for the credit or the account of the Borrowers against and on account of the Obligations of the Borrowers to the Lender under this Agreement or under any of the other Loan Documents, and all other claims of any nature or description arising out of or connected with this Agreement or any other Loan Document, irrespective of whether or not the Lender shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured.

9.9. <u>Counterparts</u>. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

9.10. GOVERNING LAW. THIS AGREEMENT, THE NOTES AND THE OTHER LOAN DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT, THE NOTES AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF DELAWARE AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

9.11. <u>Submission To Jurisdiction; Waiver</u>. Each party to this Agreement hereby irrevocably and unconditionally submits for itself and its Property in any legal action or proceeding relating to this Agreement or any of the other Loan Documents, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, to the non-exclusive general jurisdiction of any state or federal court of competent jurisdiction sitting in Delaware. Each party hereto unconditionally waives trial by jury in any legal action or proceeding referred to in this section and any counterclaim therein.

9.12. <u>Effectiveness</u>. This Agreement shall become effective once (i) the Lender and the Borrowers shall have each signed a counterpart hereof and the Borrowers shall have delivered the same to the Lender and (ii) the Bankruptcy Court shall have entered the Interim Order.

9.13. <u>Headings Descriptive</u>. The headings of the several Sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

#12148565 v3 (999921.2003)

9.14.  <u>Marshalling; Recapture</u>. The Lender shall be under no obligation to marshal any assets in favor of the Borrowers or any other party or against or in payment of any or all of the Obligations. To the extent the Lender receives any payment by or on behalf of the Borrowers, which payment or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to the Borrowers or their estates, trustees, receivers, custodians or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such payment or repayment, the obligation or part thereof which has been paid, reduced or satisfied by the amount so repaid shall be reinstated by the amount so repaid and shall be included within the liabilities of the Borrowers to the Lender as of the date such initial payment, reduction or satisfaction occurred.

9.15.  <u>Severability</u>. In case any provision in or obligation under this Agreement, the Notes or the other Loan Documents shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

9.16.  <u>Limitation of Liability</u>. No claim may be made by the Borrowers or any other Person against the Lender or any of its Affiliates, directors, officers, employees, attorneys or agents for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any act, omission or event occurring in connection herewith; and, to the extent permitted by law, the Borrowers hereby waive, release and agree not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in their favor.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and the year first written.

BORROWERS:

WE THE PEOPLE USA, INC.

By: _____

Name: _____

Title: _____

WE THE PEOPLE LLC

By: _____

Name: _____

Title: _____

LENDER:

DOLLAR FINANCIAL GROUP, INC.

By: _____

Name: _____

Title: _____

#12148565 v3 (999921.2003)

Exhibits

| | |
|---|---|
| Exhibit A | Interim Order |
| Exhibit B | Form of Note |
| Exhibit C | Borrowing Certificate |

#12148565 v3 (999921.2003)

# Exhibit A

to
Debtor in Possession Loan Agreement

See attachment.

# Exhibit B

to
Debtor in Possession Loan Agreement

See attachment.

PROMISSORY NOTE

$_____,000.00

Wilmington, Delaware<br/>_____, 2010

FOR VALUE RECEIVED, the undersigned by and between WE THE PEOPLE USA, INC., a Delaware corporation, and WE THE PEOPLE LLC, a Delaware limited liability company (collectively, the "Borrowers"), debtors and debtors-in-possession in cases pending under Chapter 11 of the Bankruptcy Code, hereby unconditionally promises to pay to DOLLAR FINANCIAL GROUP, INC. (the "Lender") or order at the office of the Lender located at _____ or at such other location as Lender may direct in writing to Borrowers, in lawful money of the United States of America and in immediately available funds on the Termination Date the principal amount of _____ Dollars ($_____.00), along with the aggregate unpaid principal amount of all Loans made the Lender to the Borrowers pursuant to the Credit Agreement.  The Borrowers hereby further agree to pay to the Lender all interest accrued on the foregoing amounts in the amounts set forth in the Credit Agreement as and when required pursuant to the Credit Agreement.  All capitalized terms used in herein that are not otherwise defined herein shall have the respective meanings ascribed to them in that certain Debtor in Possession Loan Agreement between the Borrowers and the Lender dated February ____, 2010 (the "Credit Agreement").

This Note (a) is one of the Notes referred to in the Credit Agreement, and (b) is subject to the terms and provisions of the Credit Agreement.

Upon the occurrence of any one or more Events of Default all principal and unpaid accrued interest pertaining to this Note and any and all other Notes shall become, or may be declared to be, immediately due and payable, all as set forth in the Credit Agreement and the Orders.

All parties now and hereafter liable with respect to this Note, whether maker, principal, surety, guarantor, endorser or otherwise, hereby waive presentment, demand, protest and all other notices of any kind.

**THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE.**

| WE THE PEOPLE USA, INC. | WE THE PEOPLE LLC |
|---|---|
| By: _____ <br/> Name: _____ <br/> Title: _____ | By: _____ <br/> Name: _____ <br/> Title: _____ |

# Exhibit C

to
Debtor in Possession Loan Agreement

See attachment.

# BORROWER'S CERTIFICATE

PURSUANT TO <u>Section 4.2(a)</u> of that certain Debtor-in-Possession Loan Agreement between dated February ___, 2010 (as amended, supplemented, or otherwise modified from time to time)(the "<u>Credit Agreement</u>," with all capitalized terms used herein to have the meaning ascribed to them in the Credit Agreement unless otherwise defined herein) by and between WE THE PEOPLE USA, INC., a Delaware corporation, and WE THE PEOPLE LLC, a Delaware limited liability company (collectively, the "Borrowers"), debtors and debtors-in-possession in cases pending under Chapter 11 of the Bankruptcy Code, and DOLLAR FINANCIAL GROUP, INC., as secured lender (the "Lender"), the undersigned officer of the Borrowers hereby certifies as follows:

1.　　The requested Loan and the intended use thereof are consistent with the terms of the Credit Agreement (including the Budget) and are necessary, after utilization and application of the available cash, in order for such Borrowers to satisfy their obligations in the ordinary course of business or as otherwise permitted under the Credit Agreement.

2.　　The proceeds of all prior Loans have been applied in conformity with the requirements of the Credit Agreement (including the Budget).

3.　　The representations and warranties of the Borrowers set forth in the Credit Agreement and each of the Loan Documents to which the Borrowers are a party, or which are contained in any certificate furnished by or on behalf of the Borrowers pursuant to any of the Loan Documents to which the Borrowers are a party, are true and correct in all material respects on and as of the date hereof with the same effect as if made on the date hereof, except for representations and warranties expressly stated to relate to a specific earlier date, in which case such representations and warranties were true and correct in all material respects as of such earlier date.

4.　　The making of the requested Loan is in compliance with <u>Section 4.2(a)</u> and <u>Section 2.1</u> of the Credit Agreement.

5.　　_____ is a duly elected or appointed qualified officer of the Borrowers and the signature set forth below for such officer is such officer's true and genuine signature.  The undersigned officer has no knowledge of any Default or Event of Default that has occurred and is continuing as of the date hereof.

IN WITNESS WHEREOF, the undersigned has hereunto set his/her name as of the date set forth below.

_____　　　　　　Dated: ____, 2010

Name:

Title: